## SARGENT BARGE LINE, Inc., v. NEWTOWN CREEK TOWING CO. et al.

### THE WELFARE.

## CAPITOL COAL CORPORATION v. SARGENT BARGE LINE, Inc.

### Nos. 12214, 12690.

District Court, E. D. New York.

Jan. 5, 1932.

Purdy & Purdy, of New York City (John E. Purdy, of New York City, of counsel), for libelant and cross-respondent.

Alexander, Ash & Jones, of New York City, for respondent Newtown Creek Towing Co.

Earl Appleman, of New York City, for respondent and cross-libelant Capitol Coal Corporation.

BYERS, District Judge.

These causes, tried together, embrace (a) a libel filed by the owner of the barge Welfare (which sank on the night of July 30, 1930, while lying at a dock in the Harlem River south of 145th street, on the west or Manhattan side of the stream) against the Newtown Creek Towing Company, and the Capitol Coal Corporation; and (b) a cross-libel filed by the latter for damage to cargo on the barge, against the Sargent Barge Line, Inc., the owner of the barge.

By consent, the libel in the first cause is dismissed as against the Newtown Creek Towing Company, and the decree will so provide.

The barge was loaded with 427 tons of coal taken at Port Reading on July 26, 1930, and early on that day was towed to pier 96, East River, and there remained until July 30, 1930, at 3:00 p. m. At the latter hour, the bargee was ashore, purchasing provisions, and, while so engaged, the coal corporation, the owner of the cargo (and which company had hired the barge from Bartle Daly, the charterer) caused the tug Convoy, of the Newtown Creek Towing Company, to take the barge in tow for delivery at the dock of the former located as above stated. That towage was without incident, which explains the dismissal of the libel as against the Newtown Company.

Because of the absence of the bargee, the coal corporation put aboard the barge one of its own employees, Morris by name, and, when the dock was reached, he and a fellow employee made the barge fast, i. e., stern up stream, starboard alongside the dock, two lines forward and two aft, properly made fast. There were 6 or 7 feet of slack in the stern lines, and 5 or 6 in the bow lines.

The berth having been made, Morris left the barge unattended, his duties for the day being ended. . The Welfare was 82 feet long and, when laden, had a draft of 8 feet. Cargo of over 400 tons of coal had been carried safely on numerous recent occasions.

The bargee, 21 years of age, and having been on this vessel one month prior to the date in question, was a stranger to this city, and had difficulty in locating the barge at its new berth, and did not reach the coal dock until after six o'clock in the evening.

Upon arrival, he found the barge as stated; sounded his vessel, and ascertained that it was not leaking. He cooked his supper, and returned to the deck at 7:30 to 8:00 o'clock.

A list to port had developed, and the stern starboard corner was aground. The bargee tried to shove off with a pole, but could not do so. He said that there was still slack in the lines.

He went on the dock, seeking assistance, but could find no one to aid him. He went to the bridge that crosses the Harlem River at 146th street, trying to get help from a tug, but failed in the effort. He returned at or before midnight, at which time the decks were awash; that is, the starboard stern corner was out of water, but the port corner forward was under water. At 8:00 a. m. on July 31st, the bargee telephoned his owner, and a representative of the latter arrived at between 9:00 and 9:30 a. m., and found the barge under water as stated. A survey showed a twist of eighteen inches, sufficient to open the seams, and admit water below decks and on decks to such an extent that the vessel could not rise with the flood tide, and this explains the sinking.

There is no dispute that the off-shore conditions of this dock, at the time in question,

were substantially as follows, according to soundings taken; the readings being at low water:

At the northerly end of the dock or bulkhead, at about 1 foot off shore, the depth, measured at 10 foot intervals running southerly and parallel to the dock, inclines from 4 feet to 8 feet; at 10 feet off shore, from 6 feet to 13 feet. At 20 feet off shore, the depth at 145th street is 12 feet.

There is a rise and fall of the tide of better than 5 feet in this vicinity.

Low water on July 30, 1930, occurred at about 8:40 p. m., daylight saving time, so that the barge was berthed at least three hours before that, during which interval the fall would have been not less than 2½ feet.

█ It will be seen, therefore, that the vessel was so placed by the coal corporation that the starboard stern corner was bound to rest on the river bottom at low water; and the port bow forward was bound to remain afloat, because 10 feet off shore, 70 feet south of 145th street, there was 13 feet of water at low tide. It will be recalled that the draft of the Welfare, when laden, was 8 feet. This means that the barge could not possibly trim at low water, because of the falling away of the river bottom shown by the soundings. That is to say, the coal corporation, being chargeable with notice that the barge would necessarily take a list because of the falling away of the river bottom toward the port bow corner of the Welfare, must be deemed to have calculated that a cargo of over 1,000,000 lbs. of coal, laden on a wooden vessel of the type and character of this one, would reasonably be expected to develop such a twist in the carrier, as the photographs in evidence clearly reveal; and that such a twist would reasonably be expected to open her seams.

The libelant urges that the coal corporation failed to provide a reasonably safe berth for the Welfare; and the respondent asserts that the founding was unexplained, and therefore unseaworthiness is to be attributed to the barge.

█ It is thought that the question of actual unseaworthiness can be speedily disposed of; the barge was repaired and generally overhauled in November, 1928, having previously been given general repairs in January, 1927.

In June, 1929, and again in June, 1930, caulking was done as required; two days' work having been done on the latter occasion. The entire deck was searched. The barge was old, but the evidence is entirely satisfactory that it was in good and seaworthy condition prior to this happening. Between January 3, 1930, and July 24, 1930, she carried sixteen cargoes of coal from harbor points on the New Jersey side, of which half were in excess of 400 tons.

There is no credible evidence of leaking, from departure at Port Reading on this trip, to arrival at the 145th street dock.

The barge was tied up at the 96th Street East River pier for four days, before being taken in charge by the coal corporation, during this voyage, without an incident of any kind.

These circumstances negative any suggestion of actual unseaworthiness.

█ The coal corporation relies upon its experience with other coal barges, to justify its handling of this one. The evidence on that subject, however, is of little assistance. No specific instance is given of berthing a barge overnight, where comparable conditions were shown. The testimony is that, whenever it was convenient, barges were lightened at once; at least a part of the cargo being unladen before ceasing operations for the day. The reason for not doing so in this case is stated to have been the late hour of arrival; but that was in the control of the coal corporation.

Having elected to leave this barge unattended, not breasted off by planks or otherwise, any given distance from the dock; not having left someone to warn the bargee, when he should appear, of the necessity for avoiding the danger to his vessel consequent upon the falling tide; or not having notified either the charterer or the barge owner of the conditions existing at the coal dock, it is thought that the coal corporation, as consignee, was negligent, and must be held liable for the results of its own failure to meet an obvious duty.

The circumstances here presented are sufficiently within the purview of the decisions of the Circuit Court of Appeals for this circuit, Berwind White Coal Mining Co. v. City of New York (C. C. A.) 48 F. (2d) 105; The Eastchester (C. C. A.) 20 F. (2d) 357, and M. & J. Tracy v. Marks, Lissberger & Son (C. C. A.) 283 F. 100, to render further discussion of the facts unnecessary.

The authorities cited by respondent Capitol Coal Corporation have been examined, and it is thought that they involve unexplained sinkings of barges, or failures to establish negligence on the part of a consignee; the effort has been made in the foregoing discussion to distinguish such cases from this.

The libelant has sustained its burden of proof, and is entitled to a decree, with costs, against the Capitol Coal Corporation, and the cross-libel of the latter will be dismissed, without costs.

The libel against the Newtown Creek Towing Company is dismissed, without costs.

If findings are desired, they may be settled on notice, and should contain appropriate recitals of incorporation and ownership.